MAINE MILK COMMISSION
*vs.*
CUMBERLAND FARMS NORTHERN, INC.

Cumberland County.   Opinion, December 3, 1964.

*John W. Benoit, Esq., Asst. Atty. General,* for Plaintiff.

*Sidney W. Wernick, Esq.,* for Defendant.

SITTING: WEBBER, TAPLEY, SULLIVAN, SIDDALL, MARDEN, JJ. WILLIAMSON, C. J., did not sit.

SIDDALL, J. This is an appeal from a judgment of permanent injunction issued by a single justice enjoining Cumberland Farms Northern, Inc., hereafter called Cumberland, from issuing and delivering certain coupons given on the sale of Cumberland's milk and redeemable in cash in the event that price-fixing by the Maine Milk Commission, hereafter called the Commission, be declared unconstitutional. In the hearing below the single justice did not pass upon the constitutionality of the Maine Milk Commission Law. He felt obliged to presume that the law was consti-

tutional in accordance with the well-established principle that the trial court was bound by the presumption of constitutionality.

The constitutional issue is the dominant issue in the case before this court. Cumberland challenges the constitutionality of the Maine Milk Commission Law as a violation of the provisions of the due process clauses of both the State and Federal Constitutions, and of the interstate commerce clause of the Federal Constitution.

The first price-fixing milk control legislation in this state was passed in 1935 (P. L., 1935, Chap. 13).

The legislative declaration at the time of the enactment of Chap. 13, P. L., 1935, was as follows:

> "Whereas, the distribution and sale of milk and cream within this state is a business affecting the public health, welfare and general interest of all the people of the state, and

> Whereas, unfair, destructive and uneconomic practices in the business of said distribution and sale of milk and cream have developed which threaten the disruption of said business and great loss to all persons engaged in said business and which create a situation which cannot be adequately controlled and remedied by existing statutes, and

> Whereas, in the judgment of the legislature these facts create an emergency within the meaning of section 16 of Article XXXI of the constitution of Maine and require the following legislation as immediately necessary for the preservation of the public peace, health and safety;"

This Act was designed to be permanent legislation, subject to repeal or amendment. With few exceptions the Act has been amended in some respects at all legislative sessions from 1935 to date, and has been incorporated, as amended, in the Revised Statutes of 1944 and 1954. At a

special session of the Legislature in 1961 the law was amended by granting power to the courts to issue injunctions to enforce the Milk Commission Law. (P. L., 1961, Chap. 410.) The legislative declaration was contained in the preamble to the legislation, as follows:

"Whereas, the production and distribution of milk is an industry within the State affected with a public interest; and

Whereas, the health of the public requires a continuous abundant supply of wholesome pure milk; and

Whereas, certain unfair practices have been carried on and may be carried on which are detrimental to the production, sale and distribution of wholesome milk, thereby leading to a lowering of the health standards and impairing an adequate supply of wholesome milk to the public; and

Whereas, in the judgment of the Legislature, these facts create an emergency within the meaning of the Constitution of Maine, and require the following legislation as immediately necessary for the preservation of the public peace, health and safety;"

The Maine Milk Commission Law provides that the Commission is vested with the power to establish and change, after investigation and public hearing, minimum prices to be paid to producers, and that the commission shall fix and establish, after investigation and public hearing, the wholesale and retail prices to be charged for milk distributed for sale within the state.

"Prices so fixed shall be just and reasonable taking into due consideration the public health and welfare and the insuring of an adequate supply of pure and wholesome milk to the inhabitants of this State under varying conditions in various marketing areas, seasonal production and other conditions affecting the costs of production, trans-

portation and marketing in the milk industry, including a reasonable return to the producer and dealer."

R. S., c. 33, Sec. 4.

The record discloses that Cumberland sold milk at the minimum price established by the Commission with a coupon delivered to the purchaser, redeemable for a certain sum in cash in the event that the legislation was determined to be unconstitutional.

The dominant issue in this case is the constitutionality of the Maine Milk Commission Law.

The leading case in which the right to fix minimum prices for milk was challenged on constitutional grounds is *Nebbia* v. *People of New York* (1934), 291 U. S. 502. In that case the majority opinion held that the New York Milk Control Act, which authorized the establishment of minimum prices for milk, was not violative of the Fifth and Fourteenth Amendments to the Constitution of the United States. The opinion conceded that the regulation of private business can be invoked only under special circumstances. In an elaborate opinion, the court said:

"Under our form of government the use of property and the making of contracts are normally matters of private and not of public concern. The general rule is that both shall be free of governmental interference. But neither property rights nor contract rights are absolute; for government cannot exist if the citizen may at will use his property to the detriment of his fellows, or exercise his freedom of contract to work them harm. Equally fundamental with the private right is that of the public to regulate it in the common interest.
\* \* \* \*
These correlative rights, that of the citizen to exercise exclusive dominion over property and freely to contract about his affairs, and that of the state to regulate the use of property and the con-

duct of business, are always in collision. No exercise of the private right can be imagined which will not in some respect, however slight, affect the public; no exercise of the legislative prerogative to regulate the conduct of the citizen which will not to some extent abridge his liberty or affect his property. But subject only to constitutional restraint the private right must yield to the public need. * * * *

The Constitution does not guarantee the unrestricted privilege to engage in a business or to conduct it as one pleases. Certain kinds of business may be prohibited; and the right to conduct a business, or to pursue a calling, may be conditioned. Regulation of a business to prevent waste of the state's resources may be justified. And statutes prescribing the terms upon which those conducting certain businesses may contract, or imposing terms if they do enter into agreements, are within the state's competency.

Legislation concerning sales of goods, and incidentally affecting prices, has repeatedly been held valid. In this class fall laws forbidding unfair competition by the charging of lower prices in one locality than those exacted in another, by giving trade inducements to purchasers, and by other forms of price discrimination. The public policy with respect to free competition has engendered state and federal statutes prohibiting monopolies, which have been upheld. On the other hand, where the policy of the state dictated that a monopoly should be granted, statutes having that effect have been held inoffensive to the constitutional guaranties. Moreover, the state or a municipality may itself enter into business in competition with private proprietors, and thus effectively although indirectly control the prices charged by them. * * * *

But we are told that because the law essays to control prices it denies due process. Notwithstanding the admitted power to correct existing

economic ills by appropriate regulation of business, even though an indirect result may be a restriction of the freedom of contract or a modification of charges for services or the price of commodities, the appellant urges that direct fixation of prices is a type of regulation absolutely forbidden. His position is that the Fourteenth Amendment requires us to hold the challenged statute void for this reason alone. The argument runs that the public control of rates or prices is *per se* unreasonable and unconstitutional, save as applied to businesses affected with a public interest; that a business so affected is one in which property is devoted to an enterprise of a sort which the public itself might appropriately undertake, or one whose owner relies on a public grant or franchise for the right to conduct the business, or in which he is bound to serve all who apply; in short, such as is commonly called a public utility; or a business in its nature a monopoly. The milk industry, it is said, possesses none of these characteristics, and, therefore, not being affected with a public interest, it charges may not be controlled by the state. Upon the soundness of this contention the appellant's case against the statute depends.

We may as well say at once that the dairy industry is not, in the accepted sense of the phrase, a public utility. We think the appellant is also right in asserting that there is in this case no suggestion of any monopoly or monopolistic practice. It goes without saying that those engaged in the business are in no way dependent upon public grants or franchises for the privilege of conducting their activities. But if, as must be conceded, the industry is subject to regulation in the public interest, what constitutional principle bars the state from correcting existing maladjustments by legislation touching prices? We think there is no such principle. The due process clause makes no mention of sales or of prices any more than it speaks of business or contracts or buildings or

other incidents of property. The thought seems nevertheless to have persisted that there is something peculiarly sacrosanct about the price one may charge for what he makes or sells, and that, however able to regulate other elements of manufacture or trade, with incidental effect upon price, the state is incapable of directly controlling the price itself. This view was negatived many years ago. *Munn* v. *Illinois,* 94 U. S. 113, 24 L. ed. 77. * * * *

So far as the requirement of due process is concerned, and in the absence of other constitutional restriction, a state is free to adopt whatever economic policy may reasonably be deemed to promote public welfare, and to enforce that policy by legislation adapted to its purpose. The courts are without authority either to declare such policy, or, when it is declared by the legislature, to override it. If the laws passed are seen to have a reasonable relation to a proper legislative purpose, and are neither arbitrary nor discriminatory, the requirements of due process are satisfied, and judicial determination to that effect renders a court *functus officio.* 'Whether the free operation of the normal laws of competition is a wise and wholesome rule for trade and commerce is an economic question which this court need not consider or determine.' *Northern Securities Co. v. United States,* 193 U.S. 197, 337, 338, 48 L. ed. 679, 700, 701, 24 S. Ct. 436. And it is equally clear that if the legislative policy be to curb unrestrained and harmful competition by measures which are not arbitrary or discriminatory it does not lie with the courts to determine that the rule is unwise. With the wisdom of the policy adopted, with the adequacy or practicability of the law enacted to forward it, the courts are both incompetent and unauthorized to deal. The course of decision in this court exhibits a firm adherence to these principles. Times without number we have said that the legislature is primarily the judge of the necessity of such an enactment, that every

possible presumption is in favor of its validity, and that though the court may hold views inconsistent with the wisdom of the law, it may not be annulled unless palpably in excess of legislative power."

The issues in this case have not been passed upon in our jurisdiction. In *State* v. *Latham*, 115 Me. 176, the court held that a statute designed to compel purchasers of milk intended for a particular use to pay their purchase debts at particular times or according to contract on pain of criminal prosecution was class legislation not based upon any real difference in situation or condition. In *State* v. *Old Tavern Farm, Inc.*, 133 Me. 468, a 1933 Act required that the proprietor of a milk gathering station give a bond as a condition precedent to obtaining a license. The court found *Latham* to be of controlling analogy and held the legislation violated the State and Federal Constitutions. (Fourteenth Amendment.) The following excerpts are noted on pages 474 and 475:

"*Munn v. Illinois*, 94 U.S., 113, 24 Law ed., 77, and *German Alliance Insurance Company v. Lewis*, 233 U.S., 389, 58 Law ed., 1011, sustain the right of a State to control private business when clothed with a public use. These two cases, however, go only to fixing prices.

'All businesses are subject to some measure of public regulation, . . . that the business of . . . the dairyman may be subjected to appropriate regulation in the interest of public health, cannot be doubted.' *New State Ice Company* v. *Liebmann*, 285 U. S., 262, 76 Law ed., 747.

*Nebbia v. People*, 291 U.S., 502, 78 Law ed., 940, holds that, as to prices of milk produced within the State, the industry may be regulated, within reason, if the public interest demands.

Not price fixing, but the requirement of bond to pay the price, is now the test."

In *Opinion of the Justices,* 157 Me. 152, the Justices of the Supreme Court were asked to pass upon the constitutionality of legislation requiring semi-monthly payments to producers of milk under penalty of suspension or revocation of the license of a dealer upon violation. The justices noted that they were cognizant of certain facts, summarized as follows:

> (1) That Old Tavern Farm arose under a statute enacted in 1933, and was decided in 1935, a few months after the original enactment of P. L., 1935, Chap. 13. (2) That the decision in that case represented the minority view of the decided cases in this country. (3) That the requirements of a bond to secure payments by dealers to producers (using the terms in a general sense, and not with the definition of the Milk Control Act specifically in mind) has been apparently upheld in connection with Milk Control Acts (*Nebbia* v. *New York, supra*). (4) That New Hampshire, Vermont, and Massachusetts have provided by statute for bonds to secure payments to producers of milk.

Having these facts in mind and that the question submitted was really whether the Supreme Judicial Court sitting as the Law Court would overrule its decision in the *Latham* and *Old Tavern Farm, Inc.* cases, it was deemed that the question should not be answered, but should be left to litigation.

We are not called upon here to determine whether purchasers of milk for resale may constitutionally be required to pay their purchase debt, or whether the proprietor of a milk gathering station may be required to give a bond in order to secure a license. We are therefore not required to consider whether *Old Tavern Farm, Inc.,* or *Latham* should

be overruled. The issue here is the validity of price fixing which was never an issue in those cases.

The rationale of majority opinion in *Nebbia* has been followed almost universally in the state courts of this country. A partial list of those decisions in which *Nebbia* has been cited with approval are as follows: *Montana Milk Control Board* v. *Rehberg* (Mont.), 376 P. (2nd) 508, 1962; *Borden Company* v. *Thomason* (Mo.), 353 S. W. (2nd) 735 (1962), (Unfair Milk Sales Practice Act); *Mississippi Milk Commission* v. *Vance* (Miss.), 129 S. (2nd) 642 (1961), (contains an exhaustive research of federal and state decisions involving the constitutionality of Milk Control Acts); *Schwegmann Brothers Giant Super Markets* v. *McCrory* (La.), 112 S. (2nd) 606 (1959); *Abbotts Dairies, Inc.* v. *Armstrong* (N. J.), 102 A. (2nd) 372 (1953); *Board of Supervisors of Elizabeth City County et al.* v. *State Milk Commission* (Va.), 60 S. E. (2nd) 35 (1950); *State* v. *Auclair* (Vt.), 4 A. (2nd) 107 (1939); *Ray, et al.* v. *Parker* (Cal.), 101 P. (2nd) 665 (1940); *Savage* v. *Martin* (Or.), 91 P. (2nd) 273 (1939); *Rohrer* v. *Milk Control Board* (Pa.), 186 A. 336 (1936); *State ex rel. Finnegan, et al.* v. *Lincoln Dairy Co.* (Wis.), 265 N. W. 197 (1936). See also cases cited or discussed in the following annotations: 101 A. L. R. 72; 110 A. L. R. 654; 155 A. L. R. 1403.

On the other hand *Harris* v. *Duncan* (Ga.), 67 S. E. (2nd) 692 (1951) held that the milk industry is not such business affected with a public interest as to abridge the right of contract. The rationale of the opinion was the same as that expressed in the dissenting opinion in *Nebbia*.

In *Gwynette* v. *Myers* (S. C.), 115 S. E. (2nd) 673 (1960) the court, by a three to two division rejected the idea that the public health, safety, or morals were involved in the Milk Control Act of South Carolina or that the milk industry was affected with a public interest. *Gwynette*

was upheld in the recent case of *Stone* v. *Salley* (S. C.), 137 S. E. (2nd) 788. (August 6, 1964.)

In *Feretti, et al.* v. *Jackson, et al.* (N. H.), 188 A. 479 (1936) the court struck down the milk control law on the ground that it granted such a sweeping and general delegation of power that it exceeded constitutional limits. New legislation was then passed in which the board was empowered to establish prices after a finding of an economic condition injurious to public health. In an advisory opinion the court held this provision constitutional, stating that the prices fixed by the board were not permanent but could be changed when public interest so demanded. In re *Opinion of the Justices* (N. H.), 190 A. 713. In *Cumberland Farms Northern, Inc.* v. *Pierce* (N. H.), 190 A. (2nd) 402 (1963) after such a finding, the court denied plaintiff's claim that no suitable standards were provided to guide and control the board in its determination of maximum and minimum prices.

Cumberland concedes that the state, under its police power, upon proper occasion and by appropriate measures, may regulate a business in any of its aspects including the prices to be charged for the product or the commodity it sells. It maintains, however, that the Maine Milk Commission Law, as amended, is permanent legislation (until repealed or otherwise amended by subsequent new legislation) which requires mandatorily that a government agency fix the minimum retail prices of milk at all times and incessantly. It argues that there is thereby established by law in this state, a system by which, permanently and unceasingly, the retail prices of milk must be fixed by an agency of government and that there can never be any period of time, regardless of the state of the market conditions in the industry, when a private businessman is at liberty to sell his own milk at such price as he may see fit

and that the factual situation in this case does not justify such legislation.

In *Nebbia* the New York legislation under which the proceedings were initiated expired within a designated period. It is our understanding that *Nebbia*, as well as other cases cited in the opinion, was not based upon the fact that the legislation expired by its own limitation.

In *Board of Supervisors of Elizabeth City County, et al.* v. *State Milk Commission, supra*, the court said:

"Mr. Justice Roberts, speaking for the court in *Nebbia v. People of the State of New York* . . . did not base his decision upon an emergency, but on the ground that the milk industry was an industry affected with a public interest, and therefore subject to legislative control and regulation for the public good."

In *Ray, et al.* v. *Parker, supra*, the court held that the milk industry bears a close relation to the public welfare and is sufficiently clothed with a public interest to warrant its regulation under the exercise of the police power, not only in emergencies but at all times.

In *Jersey Maid Milk Products Co.* v. *Brock* (Cal.), 91 P. (2nd) 577, 587 (1939) the court said:

"Amici curiae seek to distinguish the Nebbia case from the instant case, and particularly call our attention to the fact that the New York statute was of a temporary duration while the California act is without any limitation as to duration, but they fail to show how this difference in the two statutes does in any way divest the legislature of the power to protect an industry from a perilous condition which is permanent in character."

All acts of the Legislature are presumed to be constitutional and the presumption is one of great strength. The burden is upon him who claims that the act is unconstitu-

tional to show its unconstitutionality. *State* v. *Fantastic Fair and Karmil Merchandising Corp.*, 158 Me. 450, 476.

It is a matter of common knowledge that the milk industry is one of the important industries in this state; that it is a food absolutely essential to the health of practically every individual in this state; that it is the primary diet of babies, and their health would be jeopardized without it; that it is essential to the balanced diet of the adult members of society; that it is perishable, cannot be stored, and is peculiarly susceptible to bacteria; that a sufficient surplus supply is necessary to meet emergencies and that if the supply were to be cut off for a few days dire results would follow; that it is essential that it be delivered to consumers in the quickest possible time; that the safeguarding of its purity and the insuring of an adequate supply to the consumer presents a problem greater than in any other food product.

"The law-making bodies have in the past endeavored to promote free competition by laws aimed at trusts and monopolies. The consequent interference with private property and freedom of contract has not availed with the courts to set these enactments aside as denying due process. Where the public interest was deemed to require the fixing of minimum prices, that expedient has been sustained. If the law-making body within its sphere of government concludes that the conditions or practices in an industry make unrestricted competition an inadequate safeguard of the consumer's interests, produce waste harmful to the public, threaten ultimately to cut off the supply of a commodity needed by the public, or portend the destruction of the industry itself, appropriate statutes passed in an honest effort to correct the threatened consequences may not be set aside because the regulation adopted fixes prices reasonably deemed by the legislature to be fair to those engaged in the industry and to the consuming public. And this is especially so where,

as here, the economic maladjustment is one of price, which threatens harm to the producer at one end of the series and the consumer at the other."

*Nebbia* v. *New York,* supra, on pages 957, 958, 78 L. ed.

The object sought to be attained by the Milk Commission Law is to prevent the disruption of the sale and distribution of milk through unfair, destructive and uneconomic practices. There is a further declaration that the sale and distribution of milk is an industry affected with a public interest requiring legislation for the preservation of public health and safety. The method of attaining that object was by the establishment of prices in the state. In the absence of evidence to the contrary this court will take the statements in the preamble of legislative acts to be true, and will not substitute its judgment for that of the Legislature. Even in the absence of legislative findings, the existence of facts supporting the legislative judgment is to be presumed, for regulatory legislation is not to be pronounced unconstitutional unless in the light of the facts made known or generally assumed it is of such a character as to preclude the assumption that it rests upon some rational basis within the knowledge and experience of the legislators. *United States* v. *Carolene Products Co.,* 304 U. S. 144, 152.

The testimony in this case indicates that if price-fixing at the retail level were lifted, it would result in an influx of milk from outside the state. However, the evidence falls short of showing facts that would disprove the legislative declarations and authorize its nullification on constitutional grounds.

The provisions of the Milk Commission Law do not wrongfully delegate the legislative power to the Commission. The legislation established price-fixing and set up

adequate standards and guides to be followed by the Commission in fixing prices.

Neither the act nor the order promulgated under it is arbitrary, capricious, or unreasonable. The means adopted by the Legislature relate directly and appropriately to the object sought to be obtained.

We therefore hold that the Maine Milk Commission Law does not violate the due process clause of the Constitution of the State of Maine or the due process clause of the Constitution of the United States.

Cumberland also contends that the Milk Commission Law violates the interstate commerce clause of the Constitution of the United States on the ground that the purpose of the legislation is to protect Maine Milk producers from economic injury resulting from out-of-state free-market competition.

As previously stated, the purpose of the legislation is to prevent the disruption of the sale and distribution of milk through unfair, destructive and uneconomic practices. We cannot accept the contention of Cumberland that the testimony in the case proves otherwise. Neither does the testimony prove that conditions in the industry have changed since the legislative declarations.

The law does not attempt to control the price paid for milk purchased outside of Maine, or the sales price outside this state of milk produced here. It merely attempts to regulate sales of milk within the state.

In *Milk Control Board of Pennsylvania* v. *Eisenberg Farm Products,* 306 U. S. 346, the court held that a state statute, regulating the milk industry, which required dealers to pay producers at least the minimum prices prescribed by an administrative agency was not in violation of the interstate commerce clause of the Federal Constitution in respect to a dealer who maintained a receiving sta-

tion in the state at which he purchased milk from a neighboring farm and shipped outside the state for sale. The court in that case on page 351 said:

> "One of the commonest forms of state action is the exercise of the police power directed to the control of local conditions and exerted in the interest of the welfare of the state's citizens. Every state police statute necessarily will affect interstate commerce in some degree, but such a statute does not run counter to the grant of Congressional power merely because it incidentally or indirectly involves or burdens interstate commerce. This is so even though, should Congress determine to exercise its paramount power, the state law might thereby be restricted in operation or rendered unenforceable. These principles have guided judicial decision for more than a century. Clearly they not only are inevitable corollaries of the constitutional provision, but their unimpaired enforcement is of the highest importance to the continued existence of our dual form of government. The difficulty arises not in their statement or in a ready assent to their propriety, but in their application in connection with the myriad variations in the methods and incidents of commercial intercourse.
>
> The purpose of the statute under review obviously is to reach a domestic situation in the interest of the welfare of the producers and consumers of milk in Pennsylvania. Its provisions with respect to license, bond, and regulation of prices to be paid to producers are appropriate means to the ends in view."

Cumberland cites the recent case of *Polar Ice Cream & Creamery Co.* v. *Andrews*, 84 S. Ct. 378, 11 L. ed. (2nd) 389 (1964). In that case a state regulatory scheme which required local milk distributors to accept out of state milk only if local producers are unable to fill the distributors needs, was held to be invalid as a burden on interstate commerce. The court in this case said:

"The cases relied upon by the Commission do not save the regulatory scheme challenged here. Nebbia v. New York, 291 US 502, 78 L. ed. 940, 54 S Ct 505, 89 ALR 1469, established that minimum retail and wholesale prices for milk purchased and sold within the State do not offend the Due Process and Equal Protection Clauses. Nor is such price regulation an impermissible burden upon commerce. Highland Farms Dairy v. Agnew, 300 US 608, 81 L ed 835, 57 S Ct 549, even as applied to a distributor who purchases and cools milk within the State and then transports it to another State for processing and sale, since the burden on commerce is indirect and only incidental to the regulation of an essentially local activity. Milk Control Board v. Eisenberg Farm Products, 306 US 346, 83 L ed 752, 59 S Ct 528. In none of these cases was there any attempt to reserve a local market for local producers or to protect local producers from out-of-state competition by means of purchase and allocation requirements imposed upon milk distributors."

In *Baldwin* v. *Sielig* also cited by Cumberland, 294 U. S. 511, the New York Law forbade the sale in New York of milk obtained by a distributor from other states unless the distributor paid a price which would be lawful under New York regulations. The court held the New York Law could not outlaw Vermont milk purchased at below New York prices.

Cumberland also cited *Hood & Sons* v. *DuMond,* 336 U. S. 525, and *Dean Milk Co.* v. *Madison,* 340 U. S. 349. In *Du-Mond,* New York was found to have no power under the commerce clause to forbid an out of state distributor from establishing processing plants and additional sources of milk within the state. In *Dean,* the City of Madison was prevented from reserving the Madison market to producers located within a specified distance of the city.

In each of these cases, factors, not present in the instant case, were decisive in striking down the control legislation as unconstitutional.

The legislation in the instant case was enacted for a legitimate purpose. The burden imposed on interstate commerce was incidental only. We hold that it was not violative of the commerce clause of the Federal Constitution.

The remaining issue in this case is whether it is permissible to give away coupons with the purchase of Cumberland's milk, such coupons being redeemable in cash in the event that price-fixing of milk is declared to be unconstitutional. This same question was an issue in the case of *Maine Milk Commission* v. *Cumberland Farms Northern, Inc.*, Law Court Docket #570 (Marden, J., not sitting) certified contemporaneously with this case. The issue in that case was resolved against Cumberland and governs the decision in this case.

The entry will be

*Appeal denied.*